IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| DIANNE E. LOGAN | ) | 03 B 13825 |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |
| CENTRAL CREDIT UNION OF ILLINOIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Adv. No. 04 A 01861 |
| DIANNE E. LOGAN, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

The Central Credit Union of Illinois ("CCUI") brought the instant three-count adversary proceeding in the Chapter 7 bankruptcy case of debtor Dianne Logan, requesting that the car loan it extended to Logan on January 10, 2000, be excepted from her bankruptcy discharge pursuant to 11 U.S.C. § 523(a)(2) (exception for money and credit obtained through a false pretense or actual fraud), (a)(4) (exception for larceny), and (a)(6) (exception for willful and malicious injury to another's property).

### Background

Debtor Dianne Logan filed for Chapter 13 bankruptcy relief on March 2, 2003, and converted the bankruptcy case to a Chapter 7 on October 29, 2003. The Chapter 7 trustee for the case filed a no-asset report.

This civil proceeding within the Chapter 7 case stems from the December 21, 1999, loan application Logan submitted to CCUI. CCUI agreed to grant Logan a secured loan for the

1

purpose of purchasing a 1995 Eagle Vision TSI with vehicle identification number 2E3HD66F2SH689232 from R.L. Johnson Imports for $8900. By signing the contract on January 10, 2000, Logan agreed to accept CCUI's terms and to perfect a first-priority lien on said car in favor of CCUI. On that same day, CCUI issued a $7565 check made jointly payable to Logan and "RLJ Imports," which is the sole proprietorship of Ron Johnson, to pay the balance on the car transaction. Johnson and Logan both endorsed the check, deposited the same into Logan's Prudential Securities account, and eventually transferred the funds into Logan's personal bank account with Bank One. Logan married Johnson approximately one and a half years later and was still married to him on the trial dates for this civil proceeding, April 21, 2005, and May 16, 2005.

To date, Logan has never provided CCUI with the title to the 1995 Eagle Vision or the vehicle itself and, consequently, has never produced any document that would indicate she granted CCUI a purchase-money security interest on the expected collateral. CCUI's searches for a connection between Logan and VIN 2E3HD66F2SH689232 in the Illinois Secretary of State's records have been in vain. Moreover, the address for R.L. Johnson Imports turned out to be a residential address. In February 2001, thirteen months after granting Logan the loan, and in spite of the fact that she was substantially current on monthly installment obligations, CCUI sued Logan in Illinois state court as a result of the fact that she had not been forthcoming with the collateral that was the cornerstone of their bargain. The result of the prior litigation is not part of the record in this adversary proceeding.

CCUI requests a finding that all of Logan's obligations under the December 1999 loan agreement be deemed nondischargeable under 11 U.S.C. § 523, including the outstanding

balance of $12,839.51 plus all interest, attorneys' fees, and court costs for which Logan would be liable pursuant to the same contract. At trial CCUI appeared to abandon the second and third counts for larceny and willful and malicious injury to property in favor of the first one: the § 523(a)(2) exception for "false pretenses, a false representation, or actual fraud." The larceny and malicious-injury causes of action would, generally speaking, have required a showing that Logan actually used the loan proceeds to buy the purported collateral and then knowingly disposed of, damaged, destroyed, or converted such collateral without CCUI's approval. Instead, CCUI pursued the theory that Logan duped it into granting her a secured loan for a specific car so that Logan could use the loan proceeds for whatever she pleased and not to buy the collateral CCUI expected.

## Applicable Bankruptcy Law

CCUI's cause of action originates in the following Code provision:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt– . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2)(A). To establish a fraudulent misrepresentation within the meaning of this section, CCUI must prove the following elements:

> (i) the debtor made false statements which he knew to be false[] or which were made with such reckless disregard for the truth as to constitute willful misrepresentations; (ii) the debtor possessed the requisite scienter, i.e. he actually intended to deceive the plaintiff, and (iii) to his detriment, the plaintiff justifiably relied on the representations.

*In re Mau*, 293 B.R. 919, 923 (Bankr. C.D. Ill. 2003); *see also In re Scott*, 294 B.R. 620, 628 (Bankr. W.D. Pa. 2003) (separating the same three elements into five). The often-stated general

3

rule is that exceptions to the Chapter 7 discharge are to be construed narrowly against the creditor and liberally in favor of the debtor. *See Matter of Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992); *In re Cohn*, 54 F.3d 1108, 1113 (3rd Cir. 1995). "Though cases often say that exclusions from dischargeability should be narrowly construed, [citations], we have emphasized that they 'serve vital functions' [and that] 'Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate . . . .'" *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (quoting *In re Mayer*, 51 F.3d 670, 674 (7th Cir.1995)). For this reason, the U.S. Supreme Court held that the burden of proof for § 523(a)(2) suits should be the preponderance standard, since it "reflects a fair balance between [the] conflicting interests" of the "fresh start" policy and creditors' interests in "recovering full payments of debts" created by dishonest debtors. *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 659, 661 (1991); *see also Cohn*, 54 F.3d at 1114; *Scott*, 294 B.R. at 628; *Mau*, 293 B.R. at 923.

The requirement that the plaintiff must justifiably rely to his detriment on the defendant's representation is notable because the higher standard of reasonable reliance does not need to be proven. *See Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 443-44, 447 (1995). Justifiable reliance requires consideration of the plaintiff's particular circumstances, knowledge, and characteristics, as opposed to an objective standard requiring lack of contributory negligence on the part of the plaintiff. *See id.* at 444; *cf. Cohn*, 54 F.3d at 1117 (objective standard for parallel provision in § 523(a)(2)(B)). Further, it requires only a "cursory examination or investigation" for "patent" misrepresentations at the particular time and place of the alleged misrepresentation and not the sort of further investigation that a reasonable man would conduct. *See id.* The car-loan transaction in the case at hand was, by all accounts, a standard loan application and closing, and

the parties brought nothing to the Court's attention to indicate that CCUI had some clue indicating that Logan would not in fact be spending the loan proceeds on the specific car on which it expected to attach a lien (or would not be forthcoming with the title to whatever she did purchase). The parties likewise did not seriously contest that the reliance was detrimental in that CCUI agreed to extend a secured loan and was then put at risk by Logan's failure to provide the expected collateral.

Instead, the controversy here surrounds the first and second elements of fraudulent misrepresentation, which are inextricably bound together in the same basic inquiry: whether Chapter 7 debtor Logan made a representation she knew to be false with the intent to deceive CCUI. "Intent to deceive may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *In re Scott*, 294 B.R. 620, 628, 633 (Bankr. W.D. Pa. 2003) (citing *Gordon v. Bruce (In re Bruce)*, 262 B.R. 632, 636 (Bankr. W.D. Pa. 2001)); *see also Cohn*, 54 F.3d at 1118-19 ("Thus, we join with other courts, including the Courts of Appeals for the Sixth, Tenth, and Eleventh Circuits, in holding that the intent to deceive can be inferred from the totality of the circumstances, including the debtor's reckless disregard for the truth.").

## Discussion and Analysis

CCUI's version of what transpired is that Logan intended to induce it into granting a secured loan for a car even though she either planned to use the proceeds for things other than the collateral or intended to avoid registering her title with the Illinois Secretary of State so that its lien could be perfected. According to CCUI, she then used the loan proceeds for personal use, never purchased the 1995 Eagle Vision with them, and consequently was never able or willing to

provide CCUI with the intended collateral. Alternatively, she could have purchased the car but, for whatever reason, intended to avoid sending a certificate of title application to the Illinois Secretary of State.

Logan's version of what transpired is that she did in fact purchase the described 1995 Eagle Vision with the loan proceeds from a person named Ron Johnson, a used-car salesman who would bring used cars directly to the homes of prospective purchasers such as Logan rather than selling them from a used-car lot.[1] She contends that after depositing CCUI's check, she paid Johnson with a cashier's check drawn on her Bank One account. Because Johnson lost the original Wisconsin car title received after attending a used-car auction in Indiana, he had to reorder a duplicate title from the state of Wisconsin. After eventually receiving the duplicate from the state of Wisconsin, Johnson claims to have contacted CCUI regarding the title, only to find out that CCUI was not interested in the document. Johnson never registered the Wisconsin title showing a transfer from the prior Wisconsin owner to himself (or his "affiliate") and then to Logan with the Illinois Secretary of State.[2] Thus, no Illinois record ever reflected a transfer of

---

[1] According to the trial testimony, Johnson now operates a towing business. Whether he continues selling used cars is unclear.

[2]

Transfer to or from dealer; records.
(a) If a dealer buys a vehicle and holds it for resale and procures the certificate of title from the owner or the lienholder within 10 days after delivery to him of the vehicle, he need not send the certificate to the Secretary of State but, upon transferring the vehicle to another person other than by the creation of a security interest, shall promptly and <u>within 20 days</u> execute the assignment and warranty of title by a dealer, showing the names and addresses of the transferee and of any lienholder holding a security interest created or reserved at the time of the resale, in the spaces provided therefor on the certificate or as the Secretary of State prescribes, and mail or deliver the certificate to the Secretary of State with the transferee's application for a new certificate, except as provided in Section 3-117.2.
. . .
(c) Any person who violates this Section shall be guilty of a petty offense.

625 ILCS 5/3-113 (emphasis added).

6

the relevant VIN to Logan. Johnson eventually lost the duplicate Wisconsin document of title that would be necessary to effect an official transfer of the vehicle to Logan. As for the car itself, Logan claims to have been driving it on or about September 2001, when it experienced mechanical problems rendering it undrivable and causing her to abandon it on the side of the road near her home in Hazel Crest, Illinois. An unidentified person or company later towed it to an unidentified location. In a nutshell, Logan's version is that Johnson's admitted postloan negligence in handling the car title is responsible for CCUI's loss of collateral, not a misrepresentation she made to induce it into loaning her money.

At the time of the initial trial date during which the bulk of evidence was presented, Johnson appeared to be someone who had allegedly sold the vehicle at issue to Logan in an arm's-length transaction back in 2000 and who was now a disinterested third-party witness. On April 21, 2005, the Court ordered Johnson to bring the title to court on May 16, 2005; he appeared on May 16 but did not present the title. The Court entertained closing arguments during the May 16 continuance. At that time CCUI's attorney brought to the Court's attention the fact that the bankruptcy petition showed that Johnson and Logan are married. The marriage occurred in August 2001, though Logan obviously had known him longer – since 1996 or 1997. This omission is significant in terms of the weight his testimony should receive. Aside from the personal relationship that would prevent the initial sale in 2000 from being an arm's-length transaction, he has a pecuniary interest in the outcome of this suit. If Logan is forced to repay CCUI's loan in spite of her Chapter 7 discharge, the repayment would reduce the amount of money available for future expenditures of the household of which he is a part.

Logan produced evidence showing that she made substantial efforts at repaying the loan

for approximately 13 months and, therefore, must not have intended to defraud CCUI by taking the loan proceeds and never repaying them. Specifically, she made monthly payments during the initial term of the loan and, after CCUI filed suit against her in state court during February 2001, she offered it a $5895 settlement on the total balance due, which it rejected because Logan offered it to credit union employees and not to the attorney in the state court litigation. In a standard bankruptcy suit under § 523(a)(2), such evidence would be highly probative of initial intent to repay. However, CCUI has proffered a different theory of fraud in this case: It claims that Logan duped it into granting her an unsecured loan even though they bargained for a secured loan. In other words, she purported to agree to a car loan subject to a purchase-money security interest in the same car while intending to use the proceeds of the loan for whatever else she wanted to buy (or intending to avoid registering the VIN with the secretary of state). This less common theory of fraud is still a legitimate one, as a representation that a loan will be secured, not unsecured, is a material fact that induces specific loan terms even if the loan applicant initially intended to honor her promise to repay the principal plus interest. First, secured and unsecured loans obviously carry different interest rates corresponding to differing risks. Second, any lender subjected to a debtor's no-asset Chapter 7 filing, as CCUI happened to be in this case, would find the representation in the loan application to be material. Furthermore, given CCUI's particular theory of fraud, Logan's evidence regarding her intent to repay the loan is irrelevant. *See also Matter of Pappas*, 661 F.2d 82, 85-86 (7th Cir. 1981) (under analogous misrepresentation provision of 1898 Bankruptcy Act, debt excepted from discharge where debtor obtained loan secured by mortgage and then never purchased real property).

Logan's attorney argues that the credit union did not adequately meet its burden of

8

proving that Logan never purchased a car with the loan proceeds. He makes a fair point that more evidence could have been presented as part of the plaintiff's *prima facie* case. What is really telling in this case, however, is how much easier it would normally be to prove a positive (that a specific person owned a specific car) than a negative (that a person never owned a specific car), especially over an extended time period. The former could be proven with one or more key pieces of evidence. The latter would require more extensive searching through the secretary of state's records, but CCUI did such work and came up empty handed. Logan contends, though, that more extensive detective work could have been done using alternative databases. For a plaintiff to prove negative ownership over substantial time periods, he might also need to inspect every record of every one of the alleged owner's transactions for many weeks or months, and even then the plaintiff would not necessarily be able to substantiate that an under-the-table cash transaction did or did not take place. Thus, negative facts are notoriously difficult to establish. CCUI got the ball rolling with the obvious: Logan has yet to produce either the 1995 Eagle Vision or the certificate of title reflecting her ownership interest in it. It further demonstrated that the entity selling the alleged collateral was not recognized by the Illinois Secretary of State and that the address listed for that same car dealership was a residential address.[3] This effort was

---

[3]

Used vehicle dealers must be licensed.
(a) No person, other than a licensed new vehicle dealer, shall engage in the business of selling or dealing in, on consignment or otherwise, 5 or more used vehicles of any make during the year (except house trailers as authorized by paragraph (j) of this Section and rebuilt salvage vehicles sold by their rebuilders to persons licensed under this Chapter), or act as an intermediary, agent or broker for any licensed dealer or vehicle purchaser (other than as a salesperson) or represent or advertise that he is so engaged or intends to so engage in such business unless licensed to do so by the Secretary of State under the provisions of this Section.
. . .
(d) Anything in this Chapter to the contrary notwithstanding, no person shall be licensed as a used vehicle dealer unless such person maintains an established place of business as defined in this Chapter.

enough to shift the burden of production on this one issue of fact to the defendant Logan.[4] Although Logan emphasizes CCUI's lack of detective work on the VIN for the car she claims to have purchased, the Court cannot find that its initial burden of production was not met or that such burden did not shift to Logan. As far as what alternative databases exist for VINs, what information they contain, whether they simply duplicate information held by secretaries of state on a wide scale, and what searches could have been done in hindsight, the Court can only speculate. No expert testimony was admitted into evidence, and the information is not so commonplace and familiar as to permit judicial notice thereof.

What is significant here is that all debtor Logan had to do to counter the credit union's assertions of misrepresentation was show that she actually used her car loan proceeds to buy a car. Aside from the self-serving oral testimony of her and her husband, she could not accomplish this one relatively straightforward task. The title to the vehicle she claims she purchased could not be produced and admitted into evidence, as it allegedly vanished, although duplicate titles can be obtained at any time, *see* 625 Ill. Comp. Stat. Ann. 5/3-111 (2004). Physical evidence in the form of the collateral itself similarly vanished without so much as a trace after the vehicle allegedly broke down and was abandoned and towed. Logan produced not one document that would indicate that the particular vehicle she supposedly purchased had been ticketed and/or towed and impounded by a towing company, a junk yard, and/or a local government agency.

---

625 ILCS 5/5-102.

[4] *Compare* Fed. R. Bankr. Pro. 4005 advisory committee note ("[Rule 4005] does not address the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion, the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with evidence in the light of considerations such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector . . . .")

Additionally, after depositing the credit union's loan check, Logan claims she purchased the vehicle from her future husband with a cashier's check made payable to him. Again, production of the cancelled cashier's check or a bank record confirming a transfer to Johnson's bank account would have tended to confirm that the transaction occurred and that such funds were in fact used to purchase the anticipated collateral rather than something else. Again, Logan produced nothing other than the self-serving oral assertions of herself and a man who appeared to be at arm's length (but who was in fact her husband by the time of trial). The evasive conduct and inaction was not limited to the trial setting. Although she claims to have abandoned the inoperable vehicle near her home around September 2001, the debtor did not in any way alert CCUI that its collateral's salvage value was in peril.

Logan did produce two sets of documents that, on their face, would tend to support her contention that she did use CCUI's proceeds to purchase the 1995 Eagle Vision with a certain VIN: the bill of sale and various insurance documents pertaining to State Farm insurance coverage.

The bill of sale states that R.L. Johnson Imports, a sole proprietorship owned by Ron Johnson, sold defendant Logan the 1995 Eagle Vision on January 10, 2000 – the same date that CCUI issued the loan check for $7565.00. This document is entitled to very little weight under the circumstances. First, the transaction was not entirely at arm's length. The two parties had known one another for three to four years at the time; were married within a year and a half after the transaction; and were married at the time the bill of sale was presented to this Court as an arm's-length deal. Thus, it could easily have been manufactured by both of them after CCUI decided to take legal action on the loan. Second, although the bill of sale shows the date of the

11

sale to Logan as being January 10, 2000, the Wisconsin certificate of title for the vehicle at issue (2E3HD66F2SH689232) shows that New Image Auto Sales, Inc. sold the vehicle to Winston A/S four days after the purported sale to Logan – January 14, 2000. Thus, a sale from R.L. Johnson Imports on January 10 is not possible. While the Wisconsin certificate of title does tend to show that the vehicle existed, it does nothing to connect it to either Dianne Logan or R.L. Johnson Imports. It shows a transfer from Chrysler Financial Company LLC to New Image Auto Sales, Inc. on December 15, 1999, plus the aforementioned transfer from New Image to Winston A/S on January 14, 2000. Moreover, the evidence was insufficient to create a clear and definite connection between R.L. Johnson Imports and Winston A/S, although the testimony indicated generally that they did have some sort of business relationship.

As for the various State Farm Insurance documents relating to the summer of 2001, they too exist in the midst of suspicious circumstances that limit their evidentiary weight. They do not cover the initial period of 2000 when Logan purports to have purchased the vehicle and granted CCUI a security interest therein (or, for that matter, the end of 2000). Rather, the car-insurance policy surfaced after CCUI sued Logan in state court in February 2001, alleging that she had used its loan proceeds for something other than purchasing the collateral for which it had bargained. After being billed for this insurance in three installments from May 17, 2001, through September 8, 2001, Logan claims to have abandoned the car on the side of the road after it broke down around September 2001. We can presume she did not pay any car-insurance premiums for the Eagle Vision after that event. Before that event, the evidence indicates that she was billed for May and July installment obligations, although it does not indicate what, if any, amounts she actually paid for car insurance during this brief time period. Absent evidence that insurance

12

companies have some rigorous procedure for matching a VIN with a certificate of title and a specific person, it could be that they will initially accept the same information the Court is offered here: the oral assertion that a VIN is linked to a particular person without a certificate of title (or the car itself) to back up the claim. Insurance companies would not generally need to be concerned with people gratuitously paying premiums for cars they do not officially own, so the possibility that they might accept such an oral assertion (at least initially) exists. Plus, Johnson provided Logan with temporary Illinois license plates the entire time, so Logan may have had all the information she needed to obtain insurance for the vehicle in spite of the fact she could not officially show she owned it. The main point here is that the car-insurance bills admitted into evidence cover a period of time that is a full year and a half after the time during which Logan was to provide CCUI with its collateral, and they are just as consistent with being a strategic response to litigation as with showing that she used CCUI's loan proceeds to purchase the requisite collateral back in January 2000. Also, the group exhibit of insurance documents is partially suspect under the circumstances because the last document shows a bill for car insurance coverage from December 2001 through July 2002, although Logan claims to have abandoned the car on the side of the road during the end of the 2001 summer. Finally, even if they are seen as evidence that Logan at one time owned the 1995 Eagle Vision at issue, they do not prove that she intended to and did in fact use *CCUI's loan proceeds* to purchase specific collateral in January 2000; nor does it prove that she fully intended to cooperate in granting CCUI a security interest by registering a certificate of title with the secretary of state.

    Aside from establishing that Logan never actually used CCUI's loan proceeds to purchase the collateral she claimed to be purchasing, to show fraud here CCUI must also establish that at

13

the inception of their loan agreement, Logan represented she would be purchasing the specified vehicle with the proceeds while intending to use such proceeds otherwise. That is, to be liable under the applicable discharge exception, Logan must have had an intent to deceive that affected the bargain. Under CCUI's primary theory of this case, the bargain would have had to be infected at least from January 10, 2000, on – not after CCUI relied to its detriment on Logan's representation of security and then disbursed the loan proceeds.[5]

Several of the problematic details previously discussed do tend to preponderate around

---

[5]Under the interpretation of § 523(a)(2)(A) found in *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000), another version of "actual fraud" could justify some form of relief in this case. In *McClellan*, the Seventh Circuit noted that even though most § 523(a)(2)(A) complaints charge the defendant with fraudulent misrepresentation or "a false representation," the Code refers to "a false representation, or actual fraud," meaning actual fraud is a broader concept that includes "'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *McClellan*, 217 F.3d at 893 (quoting 4 *Collier on Bankruptcy* ¶ 523.08[1][e], p. 523-45 (15th ed., Lawrence P. King ed., 2000)). The Seventh Circuit noted that detrimental reliance on a representation is necessary only when the "actual fraud" charged is that of misrepresentation. *See id.* at 894. So, for instance, in *McClellan*, the debtor was alleged to have taken her brother's collateral for his loan in exchange for $10, sold it for $160,000, and then spent or hid the proceeds for the purpose of helping her brother evade his secured creditor. That secured creditor sued the debtor under § 523(a)(2)(A) in her bankruptcy case in spite of the lack of privity and absence of a misrepresentation between the debtor and the brother's secured creditor. The Seventh Circuit held that the allegations stated a claim for "actual fraud" even without a misrepresentation to her brother's secured creditor.

Applied to this case, this holding would mean that Logan could have committed "actual fraud" even if she decided to trick CCUI into believing it would have its bargained-for collateral only after she received the loan proceeds on January 10, 2000, and then misappropriated either the proceeds or the collateral they were intended to purchase. "A debt [excepted under § 523(a)(2)(A)] need not, therefore, arise from a loan." *See id.* at 895. So, for instance, if the debtor engages in an actually fraudulent conveyance of collateral (as opposed to a constructively fraudulent one) after entering into the loan contract, the tort creates a new debt by operation of law. *See id.* at 894-95. However, under this alternative theory of Logan's case, the damage would not be that CCUI entered into a secured loan to which it would not have agreed had it known Logan's true intent; rather, the damage would be limited to the value of the security it lost as a result of the debtor's trickery and deceptive conduct. *See id.* at 895.

The concurrence in *McClellan* would have found that the above scenario states a claim for a discharge exception under the § 523(a)(6) provision for willful and malicious injuries to the property of another. *See id.* at 896-99 (Ripple, J., concurring). By disposing of collateral in such a way that the debtor knows it will prevent the holder of the applicable security interest from collecting on its claim, the debtor willfully and maliciously injures that secured creditor. *See id.* at 898; *see also In re Burns*, 276 B.R. 441, 442-43 (Bankr. N.D. Miss. 2000). These two willful-and-malicious-injury opinions indicate that to the extent Logan was telling the truth when she admitted on the record that she abandoned her 1995 Eagle Vision on the side of the road, making no effort whatsoever to retrieve the same or to notify CCUI that its collateral was in a distressing situation, she proved everything CCUI would have had to show to establish an exception to discharge under § 523(a)(6). Like the alternative theory of "actual fraud" just described, however, the § 523(a)(6) exception would limit CCUI to the value of the collateral it lost as a result of Logan's actions and inactions.

the existence of a misrepresentation by Logan as of January 10, 2000. The vehicle Logan was purporting to buy was not being purchased from a person who was entirely at arm's length, and that same person, Ron Johnson, was also someone whom Logan requested as a joint payee on CCUI's check for $7565. Because of the relationship, Johnson was in a position to have benefitted at least indirectly from the availability of funds without having to obtain the profit of a car sale in the ordinary course of business. Moreover, Logan could not produce any bank documentation showing that once Logan and Johnson deposited CCUI's check into Logan's Bank One account, those funds did in fact go toward the purchase of a vehicle from Johnson and into an account from which he conducted his business. Finally, Johnson's January 10, 2000, bill of sale purporting to document said purchase predated Winston A/S's purchase of the vehicle from another company by four days, and a definitive, legally cognizable business relationship between Johnson and Winston A/S was never delineated. It is also important to note that Logan's future husband was involved in some type of door-to-door used-car business and thus had access to both temporary license plate signs as well as links between specific car models and specific vehicle identification numbers. Furthermore, it would not be difficult for debtor Logan to produce a specific VIN for the car-loan application. Logan also failed to sue Johnson for breach of contract or negligence in handling and delivering her car title in spite of the fact that her defense in the case at bar is that Johnson's negligence, not her deceptive conduct, is responsible for CCUI's loss of collateral. Collectively, this information tends to show that a collusive scheme to defraud CCUI into an unsecured loan existed as of the date that Logan signed a promise to use the loan proceeds to purchase specific collateral, or January 10, 2000. The scheme could have involved either using the loan proceeds for an unauthorized purpose or,

alternatively, purchasing the collateral and preventing the Illinois Secretary of State from having a record of ownership for a specific VIN. From the plaintiff's standpoint, the effect is the same either way.

In light of the reduced weight the bill of sale and various insurance documents receive, the Court finds that CCUI has met its burden of proof by a preponderance of the evidence using its own evidence in addition to the gaping holes, inconsistencies, and implausible nature of the debtor/defendant's own evidence and theory of the case.

One final issue bears mentioning at this point. The measure of damages in this case was not clearly addressed. Under the larceny and willful-injury-to-property theories, CCUI's damages would probably have required determining the value of the collateral that it lost as a result of Logan's actions and inactions. *See also supra* note 5. Under the fraud-in-the-inducement theory, though, it is fair to say that CCUI would not have entered into the specific terms of the January 2000 "secured" loan had it known that a material fact underlying the deal was not true, i.e., that Logan would not be using the proceeds for buying a 1995 Eagle Vision in such a way that it could attach a purchase-money security interest. The nature of the risk surrounding the entire deal was thus tainted by the misrepresentation even though Logan did pay many of the monthly installments for the first thirteen months. As a result, the Court finds that all contractual liabilities originating from the January 10, 2000, Loanliner Credit Agreement and Security Agreement be found nondischargeable under § 523(a)(2)(A). Without more specific evidence, however, it will not continue to liquidate the debt; the Court will only issue a declaratory judgment of nondischargeabiltiy. It goes without saying that Logan should receive credit for any payments of principal and interest she did make.

## Conclusion

All contractual liabilities originating from the January 10, 2000, Loanliner Credit Agreement and Security Agreement are found to be nondischargeable under 11 U.S.C. § 523(a)(2)(A).

This opinion constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052. A separate judgment order consistent with the opinion will be entered in compliance with Bankruptcy Rule 9021.

Date:   July 8, 2005

ENTERED:

_Jacqueline P. Cox_
Jacqueline P. Cox
United States Bankruptcy Judge